Loula Mae Harrison v. Commissioner. Levi Clinton Harrison v. Commissioner. Levi Clinton Harrison, Transferee (Awoeb Oil Company, Transferor) v. Commissioner.
Harrison v. Commissioner
Docket Nos. 7598, 7599, 7852.
United States Tax Court
1947 Tax Ct. Memo LEXIS 154; 6 T.C.M. (CCH) 782; T.C.M. (RIA) 47180; June 30, 1947
*154 James S. Grisham, Esq., 2114 Mercantile Bank Bldg., Dallas 1, Tex., and Thomas Y. Banks, Esq., for the petitioners. J. Marvin Kelley, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings were consolidated and involve, in docket Nos. 7598 and 7599, deficiencies of $963.07 and $69,487.69 in income taxes asserted against each petitioner for the respective years 1940 and 1941, and in docket No. 7852, transferee liability for deficiencies of the Awoeb Oil Co. in income taxes in the respective amounts of $10,968.51 and $57,761.02 for the years 1941 and 1942 and a deficiency in declared value excess profits tax for 1942 in the amount of $29,549.70. The primary issue, which the parties agree is decisive of many other matters in controversy, is whether the Awoeb Oil Co., a dissolved Texas corporation, was a taxable entity. Other issues for decision relate to transferee liability, and value of leases, as more particularly shown in our opinion. Still others covered by abandonment, agreement or concession or dependent on the above, will be reflected in decision under Rule 50. Findings of Fact The petitioners are husband *155 and wife residing in Texas. Their returns for the taxable years were filed on the community property basis with the collector for the second district of Texas. Petitioner Levi Clinton Harrison, hereinafter for convenience sometimes referred to as the petitioner, was engaged in drilling for and producing oil. In 1939 his operations required more borrowed money than his bank was permitted to loan to one individual, and in order to increase his borrowing power to drill more wells, the bank and petitioner's attorney suggested to petitioner that he acquire the stock of a corporation. On or about May 1, 1939, petitioner and his wife, for such and other purposes, acquired all of the stock of the Awoeb Oil Co., a dormant Texas corporation without assets, and an authorized capital stock of 500 shares, hereinafter referred to as Awoeb. It transacted business in the name of Awoeb Oil Co., opened a bank account in its name, kept books of account for its activities, and executed notes and deeds of trust and kept minutes of meetings of its stockholders and directors. A separate set of books was kept for the property owned by petitioner. At a meeting of the board of directors of Awoeb, on May 1, 1939, petitioner *156 was elected president of the corporation and authorized to convey property of the corporation; to enter into contracts for the sale, transfer and exchange of lands, leases and other real property of the corporation upon such terms as in his judgment might be for the best interests of the corporation, to enter into such other contracts in writing as the proper management of the corporation might require and to borrow money for the needs of the corporation and, without limit as to the amount, execute notes secured by all or any part of the property of the corporation. The petitioner then informed the other directors that "as it was the purpose of the company to enter into active participation in the oil business, it seemed advisable that the company acquire oil properties which would enable them to do so" and that he owned properties suitable for such purpose, which properties he was willing to sell to the corporation at cost to him, subject to any indebtedness against the properties. Thereafter, at the same meeting the directors authorized the purchase from petitioner on such terms of ten specified oil leases or interests therein. Some or all of such leases and oil interests were conveyed *157 by the petitioner to Awoeb in 1939 and 1940 to permit it to engage actively in the production of oil. Other than assumption by Awoeb of indebtedness on the property, petitioner received no consideration for the assets. Thereafter, until its dissolution in 1942, Awoeb was actively engaged in the production of oil and gas. At the meeting held on October 30, 1939, by the stockholders of Awoeb, petitioner was authorized to obtain a loan of $29,000 from Dora Roberts and execute a note in her favor for such amount, maturing in 12 months, also a note for $43,789.84 to replace a note of petitioner for a like amount. The notes were executed not later than November 1, 1939, and were secured by 498 shares of Awoeb's stock and the oil properties described in the resolution adopted by the directors on May 1, 1939, subject, however, to certain outstanding oil payments. On November 2, 1939, petitioner resigned as president and was elected vice president of Awoeb, and Dora Roberts was elected president and director of the corporation. The directors then authorized them to conduct the activities of Awoeb. At a meeting of the stockholders of Awoeb on March 4, 1940, Dora Roberts announced that *158 since the corporation's indebtedness to her was being paid off, the shares of Awoeb's stock outstanding in her name as security for the indebtedness were being transferred to petitioner and his wife, and resigned as president of the corporation. On the same day the directors elected petitioner president of Awoeb. The petitioner informed the directors at the meeting that it would be necessary for the corporation to do some refinancing to pay debts of about $104,000, including indebtedness to Dora Roberts; that he had received a one-half interest in two mineral interests and leasehold estates, known as Addis and Denman leases, upon the dissolution of the Bohago Oil Corporation on December 31, 1937, encumbered by a lien and an assignment of oil runs in favor of the Mercantile National Bank, and that he would convey his interests in the property to Awoeb in consideration of an assumption of the indebtedness to the bank in the amount of about $128,787.75, and that the bank would loan to Awoeb about $232,000 with which to liquidate the Bohago Oil Corporation's debt and the indebtedness of Awoeb subject to a pledge of the oil interests petitioner received from the Bohago Oil Corporation and *159 mineral interests then owned by Awoeb, except the Minnie Bock lease. Petitioner also received from Bohago, a one-half interest in the Connell lease, consisting of 160 acres, of a fair market value of $12,500. The proposal of petitioner was accepted and the directors and officers of Awoeb were authorized to consummate the transactions. Thereafter, on the same day, petitioner transferred his one-half interest in the Addis and Denman leases to Awoeb. Except for the period during which Dora Roberts held 498 shares, all of the stock of Awoeb, except qualifying shares, was held by petitioner and his wife. On May 1, 1940, Awoeb's president and treasurer (or either of them), were authorized by the directors to execute on behalf of the corporation any division and transfer orders and sales contracts affecting oil or gas belonging to the corporation. On July 10, 1941, the directors of Awoeb ratified a sale by the corporation and Bond Oil Corporation of certain oil and gas leases owned by them, including 18 producing wells located thereon, and other property, to the Stanolind Oil and Gas Co. for $275,000 cash, four notes, each in the amount of $61,000, two of which were payable to Awoeb *160 and the other two to Bond, and an oil payment in the amount of $404,591.50, payable one-half to each corporation. The property sold was owned in equal proportions by the sellers. The cash and notes and a guaranteed oil payment in the amount of $405,966.80 were received by Bond and Awoeb from Stanolind for the property. The drilling of 13 of the 18 wells was financed by loans made by Bond and Awoeb from the Republic National Bank of Dallas at the rate of $20,000 a well. On July 23, 1941, the directors of Awoeb authorized petitioner to borrow money from the Republic National Bank of Dallas and pledge as security therefor the two notes and the corporation's one-half interest in the oil payment received from Stanolind. On that date Awoeb borrowed a total of $236,000 from the bank. By a resolution adopted on February 16, 1942, Awoeb guaranteed the payment of two notes of petitioner held by the Mercantile National Bank at Dallas, one of which notes was in the amount of $17,500 and the other for $187,489.63. The resolution recites that the notes were secured by a deed of trust on certain oil and gas leaseholds and that the money loaned by the bank on the security was used in part for *161 the benefit of leases owned by Awoeb, and part in the development and operation of the leases. The petitioners received a dividend of $31,649.99 from Awoeb in 1941, one-half of which is taxable to each petitioner. The stockholders of Awoeb consented, on December 22, 1942, to the dissolution of the corporation. Thereafter in 1942 all of the assets of Awoeb were distributed to petitioner, who, with his wife, owned all of the corporation's stock. The assets distributed had a fair market value of $332,668.04. Some of the assets had been pledged as security for the payment of notes aggregating $239,500, which notes were paid by the petitioner. Petitioner never received any compensation from Awoeb for personal services rendered to it. The separate income tax returns filed by the petitioners on a community property basis purported to take into account as their individual income and deductions, all income and deductions of Awoeb. Income and declared value excess profits tax returns filed by Awoeb for 1941 and 1942 contained no figures and a notation on the first page reading "Corporation dormant, no activities." Attached to each return was a statement to the effect that income of *162 Awoeb constituted income of the petitioners. Awoeb filed capital stock tax returns for 1940 and 1941 showing taxable value for its stock of $100,000 and $550,000, respectively, and a tax thereon of $110 and $687.50, respectively. The business of the corporation was stated in each return as "oil production." For the fiscal years ended April 30 in 1941 and 1942 Awoeb, the Carlos Oil Corporation and two individuals, as members of a joint venture in the operation of leases known as Blucher, Smith and Vetters, filed partnership returns in the name of "Carlos Oil Corporation - Awoeb Oil Co. (L. C. Harrison) et al." Awoeb and W. A. Schmid, as joint venturers, filed a partnership return for the fiscal year ended May 31, 1941, in which were reported income and expenses in the operation of the Minnie Bock lease. A partnership return was filed for the year 1940 in the name of Bond Oil Corporation, L. C. Harrison and Awoeb Oil Corporation as a joint venture, in which were reported income and expenses in connection with the operation of nine leases, known as the Addis, M. R. Barry, Connell, M. H. Davis, Denman, Dorr, Mid-Seale A and B, and West. L. C. Harrison and Awoeb were listed in the *163 return as the owners of a onehalf interest in the leases being operated, and the Bond Oil Corporation as the owner of the other one-half. In December 1943 the petitioner signed a statement addressed to the Commissioner to the effect that upon the dissolution of Awoeb he received as a shareholder thereof, assets of an aggregate value in excess of proposed income and excess profits taxes of the corporation and was liable as a transferee for the payment of any taxes which might be determined to be due. Opinion Tax Status of Awoeb
In contending that Awoeb was not a taxable entity in 1940, 1941, and 1942, petitioners allege, in substance, that they acquired stock control of the corporation to enable them to increase their borrowing power at banks, having borrowed the maximum amount as individuals, for the purpose of further development of oil and gas leases, and that in carrying out such purpose, the corporation did not at any time have more than a nominal existence, and as such was merely their alter ego or subservient agent. The respondent contends that the question is controlled by , a case distinguished by the petitioner. *164 In the Moline Properties case, the corporation was organized in 1928 as a security device at the suggestion of the mortgagee of property owned by an individual. The corporation acquired the property from the individual and assumed the mortgage debt, and its stock, except for qualifying shares, was placed with a voting trustee at the suggestion of the creditor. In 1933 the mortgage debt was refinanced and control of the corporation reverted to the individual. In 1936 the debt was paid out of the proceeds of sale of part of the property and at other times the remaining parcels were sold. A portion of the property was leased for a parking lot. The corporation kept no books; and did not maintain a bank account and owned no assets other than the property described. In the course of its opinion, holding the corporation to be a taxable entity, the Court said: "The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business *165 activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * *" There is no doubt that Awoeb served a useful purpose in the conduct of a business activity initiated in the first instance by petitioner. The petitioner resorted to the corporate form of doing business when he reached the limit of his borrowing capacity in the conduct of his business as an individual. The corporation was availed of to obtain additional loans on the security of property conveyed to it by petitioner and the funds were used for drilling operations and other activities incident to the development of oil and gas leases. In addition to ownership of property free of any claim of the petitioner, except as a stockholder, the corporation had the usual administrative officers, kept books, maintained a bank account, held meetings of its stockholders and directors, and with some minor exceptions carried on business activities for profit in the usual way corporations conduct their affairs. Petitioner attempts, unsuccessfully we think, to distinguish the Moline case. The continuation of business after accomplishment of the original corporate purpose, *166 relied on, covered the years before the Court, as here. It did not continue thereafter. Control of the corporation by the petitioner there was not negligible, as petitioner suggests, for "control of petitioner reverted to Mr. Thompson" in 1933, and the years 1935 and 1936 were before the Court. The fact that the corporation there kept no books and maintained no bank account during its existence is a clear indication of a case weaker for the respondent than this one where books and bank account were maintained and business done in a regular corporate manner. The element of agency by corporation for individual, ordinarily relied on in cases such as this, is not present here. Mere ownership by petitioner and his wife of the corporation's stock did not, of itself, create such a relationship, Such ownership did not exist from the latter part of October 1939 until March 4, 1940, a period during which the stock was in the name of a creditor as security for a loan. The essential reason for acquiring Awoeb was the petitioner's inability to borrow individually, so the idea of mere corporate agency for petitioner is negatived. The corporation did *167 what the petitioner could not do. The cases cited by the petitioners are distinguishable. In 112 , the corporation was a mere trustee or conduit through which the income passed. In , the court held that the corporation was a mere agent of its parent and the two corporations a single enterprise. A similar case is . In , the corporation was nothing more than an agency to hold record title to property. Here, the corporation's activities were not so limited; rather they were not materially different from corporations engaged in a like business and whose stock is not closely held. It was not unreal or a sham; rather it was utilized as a substitute for the method petitioner had been following to do business, and in addition enabled him to expand the activities he had been conducting as an individual. The difference between a corporation and its stockholders or sole stockholder is disregarded for tax purposes *168 only under exceptional circumstances. ; . Such circumstances are not present here. Accordingly, it was not error for respondent to treat Awoeb as a separate taxable entity. Transferee Liability The point of difference of the parties here is on the amount of petitioner's liability as a transferee. Except for a Packard automobile, which respondent includes at a value of $2,400, the parties are in agreement upon the value of the assets received by the petitioner. The proof here is that the automobile was transferred to petitioner in 1941 in a transaction having no relation to the dissolution proceedings in 1942 and, in accordance therewith, we did not include any amount for such property in finding that the fair market value of the assets received by petitioner was $332,668.04. The parties agree that the liabilities paid by petitioner were in the aggregate amount of $239,500. The respondent contends that petitioner's liability is measured by the value of the assets received, less the liabilities of $239,500 paid by the latter, with the statement that "it might well be assumed" *169 that petitioner received assets of a net value in excess thereof. The petitioner argues that his liability is limited to his community one-half, or $46,584.02 of the net value of $93,168.04 of the assets distributed. The respondent relies upon the written statement made to him by the petitioner on December 24, 1943, to the effect that he was liable as a transferee for taxes found to be due from Awoeb. The respondent cites no authority to support his contention and we find none. Estoppel was not pleaded by him; therefore, no such issue is before us. The statement was made prior to the determination in 1945 of the transferee liability and does not have the dignity of a stipulation. No showing was made by respondent of the amount of the deficiencies proposed at the time the statement was made. Petitioner's liability then, as now, was no more than the amount of assets received. . The statement constitutes nothing more in the final analysis than petitioner's opinion of his transferee liability, a mixed question of law and fact. It was not such a statement as to deny petitioner the right to have his liability determined on the merits in *170 a proceeding before this Court. ; ; ; ; . The petitioner cites no authority to support his contention that his liability as a transferee does not exceed one-half of the net value of the assets received by him, and the point is not discussed in the brief of respondent. The stock was owned by petitioner and his wife but the proportions are not shown. The respondent, who has the burden of proof on the extent of petitioner's transferee liability, offered no proof that such shares of stock as petitioner owned were his separate property. Under the circumstances we must presume that they were community property. Carney v. T. W. Marse & Co., 288 S.W. (Tex.) 614; Wagnon v. Wagnon, 16 S.W. (2d) (Tex.) 366; Wolf v. Hartmangruber, 162 S.W. (2d) (Tex.) 112. That fact, however, does not control the answer here. The rights of husband and wife in community property in Texas have been classified as *171 a marital partnership and are founded upon principles of exact equality as to property rights of the spouses. ); ; ; . The husband is regarded as the head of, or agent for, the community and in a restricted sense is trustee for his wife as to community property. Scott v. Scott, 170 S.W. (Tex.) 273; Dallas Plumbing Co. v. Harrington, 275 S.W. (Tex.) 190; . In (C.C.A. 5), the court held that the action against the transferee was in the nature of a proceeding in rem, and that the debt for taxes was an obligation of the transferor, which the transferee paid with funds belonging to the taxpayer, but held in trust for him and his creditors. The courts of Texas have held that community property is liable for community debts, including debts of the husband. ; ; . *172 See , in which the court said that under the laws of Texas, community property is subject to administration in the estate of the husband. It is apparent that whether we regard the liability here as a debt of the transferee or payable out of the property held by petitioner as a trustee for creditors of Awoeb, petitioner is liable as a transferee to the extent of the value of the assets received by him, which amount, except for a minor adjustment made by us, the parties agree to be $93,168.04, and we so hold. Loss on Connell Lease The respondent reduced by $6,853.73 the amount of loss sustained by petitioner in 1941 upon the abandonment of the Connell lease, in which he held a one-half interest. The only point submitted for determination under the issue is the fair market value of the lease on December 31, 1937, when it was acquired by petitioner upon dissolution of the Bohago Oil Corporation. The petitioner contends that his one-half interest in the lease had a fair market value of $15,000 and the respondent contends that such value was $10,000. The difference in value is due primarily to whether there should be taken into *173 account any value for deep rights. The witness for the respondent gave no consideration to production from deeper sands upon the ground that on the basic date rights to produce oil from greater depths had no more than a nominal value. Other testimony establishes that prior to that time oil had been produced from deeper wells located on property a few miles from the Connell lease, and that the right petitioner had to drill deeper wells had a value. Taking such value into account, we have found that the interest of petitioner in the lease had a fair market value on December 31, 1937, of $12,500. Depletion - Connell Lease The respondent decreased depletion taken by petitioners in 1940 and 1941 on several leases, including the Connell lease, by the aggregate amounts of $1,248.28 and $911.94, respectively. The only point in controversy under the issue is the fair market value of petitioner's interest in the Connell lease on December 31, 1937. We have held such value to be $12,500 and depletion will be recomputed, if necessary on that amount as the correct value. Decision will be entered under Rule 50.